Eva Zinkas, also known as Eva Juikas, complainant-appellant,

*v.*

Theresa Patrick and Manning Patrick, her husband, Mary Zimitat, widow, and the State of New Jersey, defendants-respondents.

[Submitted October term, 1939. Decided March 29th, 1940.]

*Messrs. Rospond & Rospond (Mr. Felix Rospond)*, for the complainant-appellant.

*Mr. John E. Toolan,* for the defendants-respondents Theresa Patrick and Manning Patrick.

The opinion of the court was delivered by

Case, J.

The bill sought a reconveyance of lands to complainant and an accounting of certain funds alleged to have been received by defendant Theresa Patrick with relation thereto. It alleged that the property had been purchased at a cost of $14,250, of which $7,250 was paid from complainant's separate funds and subsequently $7,000 from the joint earnings of complainant and John Zimitat; that complainant was informed and always believed that the title was to be placed, and was placed, in her name absolutely, whereas in fact the conveyance was to her and John Zimitat as grantees; that in

1931 Zimitat, now deceased, and his daughter, Theresa Patrick, fraudulently induced complainant to join with Zimitat in conveying the property to Mrs. Patrick upon the false representation that it was a conveyance to the State of New Jersey of lands for a state highway, and that Mrs. Patrick later conveyed a portion thereof to the State of New Jersey for the consideration of $2,500 and still later collected $1,025 insurance money for a fire loss on the premises. The bill prayed that the conveyance to Mrs. Patrick and the one from her to the state be declared null and void; that the respective rights of the parties in the premises be determined and reconveyance be directed to the parties so found to be entitled, and that there be an accounting. The parties defendant named in the bill were Mr. and Mrs. Patrick, the mentally incompetent wife of John Zimitat and the State of New Jersey. For reasons that will subsequently appear, chief of which is complainant's withdrawal from the full extent of the relief prayed in the bill, there is no need for an extended study of the rights of the state or of Mrs. Zimitat's dower. Neither of the last mentioned defendants appears before us on this appeal.

The Court of Chancery found that the charges of fraud had not been sustained; that the relief sought should be denied in all respects; and that any other relief, as by reformation of the deed to Patrick, should be denied because it was not asked for, was inconsistent with the complainant's proofs and, most important, complainant had fraudulently conceived her suit and had come into court with unclean hands. The bill was dismissed. Our investigation and analysis of the evidence (*Cartan* v. *Phelps, 91 N. J. Eq. 312; Naame* v. *Doughty, 109 N. J. Eq. 535; Real Estate-Land, &c., Co.* v. *Stout, 117 N. J. Eq. 37*) brings us to a factual conclusion different from that reached by the learned vice-chancellor; and because the granting of relief depends so largely upon the ascertained facts we deem it advisable to state in some detail our view of the proofs.

John Zimitat was intelligent, had some education, spoke English and Lithuanian very well, could read and write in both languages and was cautious in and familiar ·with busi-

ness transactions. He held himself out as a widower. The fact was, however, that he was the husband of Mary Zimitat, who, to his knowledge, was not dead but was an inmate of one of the state institutions for the mentally affected whither she was taken by Zimitat on February 10th, 1903, and where she still is. Theresa Zimitat Patrick, the main contesting defendant in the trial below and respondent here, is the daughter of John and Mary Zimitat. She was born October 15th, 1898, and says that she was told by her father, and believed from earliest childhood until after her father's death on June 8th, 1935 (at the age of sixty-seven years), that her mother, Mary Zimitat, was dead. She completed the first year in high school and has a fair education. She resided with her father until, on her marriage to Manning Patrick December 1st, 1919, she left to set up her own home. Zimitat and a fellow worker, William Mikulanis, were then living on and operating a rented farm. Zimitat, aside from a bank account which he had opened at the First National Bank of Perth Amboy two or three months earlier, then owned no considerable property. However, he was accumulating live stock and farm equipment.

About thirty years ago complainant, Eva Zinkas (the name is given various phonetic spellings), and shortly thereafter her sister Annie, Lithuanians, came from overseas and obtained employment at a cigar factory. They became expert operators, were paid high wages and saved, partly in bank, partly in cash, the major portion of their earnings. They were unable to read or write and came to Zimitat to have their letters from home read and for the writing of replies. Soon after Theresa's marriage, Zimitat proposed to complainant that she give up her job and come to live with him and that later the two would be married. Complainant, believing Zimitat's assurance that he was a widower, accepted the proposal, taking her sister with her. There never was a marriage ceremony. Complainant, from time to time, asked for it, and Zimitat always agreed but procrastinated. There can, however, be no reasonable doubt that the two lived as man and wife. Complainant says they did. Zimitat introduced her publicly as his wife. An option for the sale of real estate

was drawn in the names of John Zimitat and Eva Zimitat and was signed in those respective names, John Zimitat by his own hand and *Eva Zimitat* by mark. A small tract of land was acquired in their names as vendees—Eva *Zimitat* and John Zimitat, *her husband.* At Zimitat's suggestion, the two made reciprocal wills on February 18th, 1925, wherein complainant cut off her brother and sister with a bequest to each of $10 and gave the residue of her entire estate to Zimitat, naming him as sole executor, and Zimitat limited his daughter, Theresa, to a like amount of $10, gave all the rest and residue to complainant and named her as sole executrix. These wills remained unrevoked, and Zimitat's instrument is now under probate as his last will and testament. Zimitat's reason for persistently evading the marriage ceremony is now obvious in the fact of a living wife. The prior continuing marriage, although unknown to complainant, of course made impossible a valid marriage, common law or ceremonial, between her and Zimitat. Nevertheless, the woman served him faithfully until his death. Even Theresa says, "I looked at Eva [complainant] like a mother," "I thought the world of her;" and Theresa urged her father, so she says, to marry complainant.

So much for the personal relations. We pass to the conditions under which the lands in question were purchased and the sources from which the purchase money came. During the period of about two years after complainant went with Zimitat the operations on the rented farm little more than carried themselves, with negligible cash surplus. Then Zimitat persuaded complainant to put her life savings into the purchase of the new farm, containing about forty-six acres of land. The title passed February 5th, 1923. Complainant believed, according to her evidence, and continued to believe until Zimitat's death, that the entire title was to be put, and was put, in her name. The deed actually ran to John Zimitat and Eva Zinkas. The price was $14,250, of which $7,250 was paid in cash drawn from complainant's bank account and $7,000 by mortgage. Complainant's bank account shows that on December 30th, 1922, exclusive of a presently mentioned deposit of $3,100 made on that day, the balance

was $4,915.77. Nothing had been put into that account with the exception of interest credits since August 15th, 1918, about two years before the relations with Zimitat began. A significant fact is that the deposits made in the account during the period of factory employment had not been made in driblets from current earnings but in sizable round figures ranging from $200 to $1,100, indicating that it was the depositor's habit to maintain, as she says she did, a cache of actual money from which withdrawals were made from time to time to place in bank. There is no substantial contradiction in the evidence, so far as we discover, of complainant's testimony that the $3,100 deposit, *supra,* was from the accumulated cash of factory days.

Zimitat had a bank account, mentioned above, which, according to the bank record, was opened September 13th, 1919. The maximum balance during 1922—the year preceding the land purchase—seems to have been $1,927.36 without any withdrawals which, either in amount or date, would serve to make up or contribute toward the deposit of $3,100 made on December 30th, 1922, in complainant's account. So we know that of the cash payment of $7,250 at least $4,150 came from complainant's separate money, and we have sound reason for believing that the remaining $3,100 came from the same source.

During the years of their joint operation of the farm the income naturally came first to Zimitat. Complainant took what he turned over to her, accepted it as common property, banked it with what remained of her earlier deposits and from that fund paid some of the recurring interest charges and, ultimately, the entire principal of the mortgage—$4,000 on January 28th, 1927, and $3,000 on August 2d, 1928. Clearly, the mortgage indebtedness was paid from their joint earnings. All of these things were done on Zimitat's direction. Complainant had implicit confidence in him and did, unquestioningly, precisely what he told her to do. He was her elder in years, her superior in intelligence and education, her *pseudo*-husband and her mentor in business matters.

We come to the vital subject of the transfer of the title to Zimitat's daughter, Theresa Patrick, on August 17th, 1931.

The state was preparing to acquire land and build a highway through the farm. The surveyors' stakes, or some of them, were set, notwithstanding direct negotiations for the acquisition of the land and the striking of the bargain by the highway department did not occur until September and actual construction did not start on the premises until November. The whole Zimitat family had been agog over the prospect of the anticipated sale of highway lands at a large price. Theresa testifies:

"Well, we were all talking about it. They thought they were going to get big money * * *."

Complainant testifies:

"Q. How long before the road was put through did you know that it was going through? A. I saw the men as they were measuring and they chopped out the corn and they chopped out the cabbages. The men were measuring and everyone was talking that there was a road to be built out there. Q. Did they notify you before they started to chop out the corn and cabbage? A. I didn't know anything only John Zimitat was doing everything and I only saw how they were doing it. Q. What did John Zimitat tell you about the highway? A. He told me that the state is buying a road and buying land to build a road."

Whatever was in John Zimitat's mind, or however long it had been there, about the transfer of the title to Mrs. Patrick he said nothing to complainant until the morning of the transaction when the incident was put to complainant, according to her testimony, in this way:

"Theresa Patrick drove up to us at home and we were making ready for market and she spoke to John. He told me to get dressed, 'You are going to ride to New Brunswick and you will make a cross,' he said, 'You will make a cross to the state for money,' that I have to make a cross that I will get some money, because if I don't make the cross then I won't get any money, and I listened to that and believed him and I rode. Q. Did he tell you what kind of a paper you were to sign? A. He told me that I had to make a cross for state, that I will get money. Q. Was Mrs. Patrick present at the time? A. Yes, we were there all four."

And on cross-examination the complainant further relates the incident thus:

"You tell us just exactly what Mrs. Patrick said to you? *A.* She drove up to the house and she stopped and we were making market, my sister, William Mikulanis and I. She come out of the car and started to talk with John, and then John said to me that I should get dressed up and we were going to New Brunswick, that I should make a cross for money, that the state will give me money."

Theresa's story is that she did not go to the Zimitat farm but that she and her husband were at breakfast—"about nine o'clock"—when Zimitat and complainant drove up in their truck, and Zimitat said to the witness, "I want you to take us to New Brunswick. We got a little business to do;" that without further explanation Theresa complied and that on the way to New Brunswick her father said that "they wanted to transfer the farm to me," whereupon the witness asked, "Why, how come?" and her father replied, "Well, we are getting old and we are getting tired and we don't want to be held responsible all the time with everything." Theresa further says that the matter had never before been discussed with her and she asked her father, "What are you going to do?" and that he replied, "Oh, we'll stay on the farm a while and keep it up in shape and you give us a little help and pay the taxes and it's your troubles. You take care of everything from now on;" and that with that meager explanation the trio went to Mr. Hagerty's law office where an absolute conveyance in fee-simple, with full covenants of warranty, was executed and delivered from Zimitat and complainant to Theresa Patrick. Thus, without discussion, without consideration (except that Theresa alone of the witnesses recalls that she paid a dollar) and on an hour's notice, if that is the way of it, two thrifty, hard-working people stripped themselves of their home and the great bulk of their life savings by gift to a woman who was not of their household and of no kin to one of them. But we do not believe that that was the way of it. To believe is too great a burden upon credulity. The story fails to square with the established facts and necessary inferences. The amazement which such

a transaction evokes is forcefully, if inelegantly, illustrated by Manning Patrick's testimony that when his wife came home that night and told him that the two had deeded the farm to her, his first remark was, "What the hell did they do that for?" In all of the 200 printed pages of testimony there is no record of a word of thanks or an expression of appreciation from Mrs. Patrick to either her father or the complainant for the conveyance that she now claims as a gift. The showing of the proofs in this respect is not incompatible with the theory that Mrs. Patrick was participating in an undertaking wherein she, knowingly, was not to profit as a donee. Only three days earlier Zimitat had bought, through Patrick, a new farm truck, for use in the enterprise as a going business, at a price of $843.

Mr. Thomas H. Hagerty, an attorney-at-law of unquestioned standing and integrity, who drew the deed transferring title, said that he knew Zimitat and Theresa from earlier employments but that he had never before seen the complainant; that on the day in question Mrs. Patrick, Zimitat and complainant came to his office and that Mrs. Patrick said that her father and this woman wanted to convey the farm to her; that he drew the deed accordingly and explained the same to the grantors and that complainant, although she did not speak good English, understood him—"I want to be very frank about it. Mrs. Eva [complainant] spoke in broken English and Zimitat spoke good English and understood what was going on." Mr. Hagerty testified further:

"Well, I would say that in my presence and in my office that day there was nothing said as to why the property was being conveyed to her. They might have had some previous arrangement. She was his daughter. He spoke about that and he was going to convey the property to her. There was nothing said as to what actuated him to make the conveyance and to convey the property to his daughter. I don't know. Q. There was nothing said as to whether or not the daughter was to take care of them or support them? A. Yes. I will say this, that he said, 'We will have a right to live on that farm as long as we want,' and I am quite sure that Mrs. Patrick—I am positive that Mrs. Patrick said, 'Pop, you live

there as long as you want;'" and again, that when the witness was explaining to the grantors that they were depriving themselves of the farm Mrs. Patrick broke in with "Pop, you can live on that farm as long as you want, you and Eva." Asked why, with that understanding, he had not inserted a reservation of life estate in the deed, he said, "I don't know whether I can answer it, vice-chancellor. I supposed it was an understanding between them, and I didn't put it in the deed." Mr. Hagerty gives no demonstrative proof that complainant understood the transaction as he explained it. That was his conclusion. His testimony leaves us with the view that he truly believed she understood; but the welding of all of the proofs into an intelligible whole brings us to the conclusion that she did not understand, and that, on the contrary, her loyalty to Zimitat was so unwavering and her faith in him so implicit that when he told her that the purpose and effect of the instrument were thus and so her understanding was closed to a variant explanation phrased in language with which she was not at ease.

Mr. Hagerty's testimony serves to emphasize, however, the large value which even Mrs. Patrick then attributed to the highway lands, because he tells that the asking price was forthwith put at $10,000. $2,500 was ultimately paid, of which $500 was applied to lawyers' fees and $2,000 was received by Mrs. Patrick. Other testimony by Mr. Hagerty, illuminative of the importance which the prospective sales assumed in the minds of local owners of real estate long before the making of formal offers and before the transfer to Mrs. Patrick, is this:

"The state highway was contemplating for about a year or a year and a half without opening up this new road. Everybody was being negotiated down there as to the price they would sell their property for. Zimitat knew at the time that there was probably going to be a new road put through there. I say it went along for about a year. The papers were full of it, were filled with the news that they were opening up this route 25 direct to Trenton, so everybody knew about it, and negotiations were going on. There's no question at all about that, but when they came down to definitely

settle the matter, then I say it was about—well, subsequent to the execution of the deed from Zimitat and his wife to Mrs. Patrick."

And this, too, is significant: "He [Zimitat] said he was a widower." The deed to Mrs. Patrick so describes Zimitat and the acknowledgment so recites.

What transpired at Mr. Hagerty's office made not the slightest difference at the farm. Those who lived on and worked there before the conveyance continued to do so thereafter. The profits were theirs, as always. There was no change suggested until the demand by Mrs. Patrick for possession after Zimitat's death, four years later.

The question of taxes calls for mention. Taxes for 1932 and 1933 were assessed as theretofore to Zimitat and complainant. The 1932 tax, $318.20, was paid in July, 1932, and the 1933 tax, $297.60, was paid in July, 1933. On July 19th, 1932, Zimitat withdrew $318.20 from his deposit at a Perth Amboy bank, and on July 31st, 1933, $297.60 from the same account. The identity of the items and of the approximate dates is too marked for any conclusion other than that Zimitat paid those taxes. Indeed, the daughter admits that he did, but she says that she gave him money in unfixed amounts and on unnamed dates wherewith he made the payments. The testimony is quite too intangible to convince us of its truth. If money was paid, it was more likely to have been on account of loans which had been made by Zimitat and complainant to the Patricks. The 1934 tax and the taxes thenceforward were assessed against Mrs. Patrick because she went to the tax office and asked that that be done, but none of them were ever paid.

It is Mrs. Patrick's testimony that she drove complainant to the cremation of Zimitat's body; that shortly after that ceremony had ended complainant showed anxiety to get home to care for the live stock and on the way to the farm complainant said to Mrs. Patrick, "What you do now, Theresa? You boss now for farm, what you do now?" Mrs. Patrick received corroboration from her daughter and a friend, but the credibility of the testimony as a full or even as an accurate account of what was said and by whom is

much shaken by an incident that happened the very next day when Mrs. Patrick, as she testified, went with her husband and their attorney to the farm, sought out the complainant who was working in the fields, and Mrs. Patrick said to complainant, "What do you say Eva, get all the papers together. We take them for a lawyer and we straighten whole business up," whereupon, according to the attorney, complainant said she had no papers and ordered the visitors to get off the land; and the lawyer left.

Manning Patrick's testimony is that on the evening of the day of the transfer he asked Zimitat what the latter was going to do and that Zimitat replied, "Uh, maybe I'll buy a small farm and put a little place up and take it a little easy;"— *maybe!* Mrs. Patrick's version of the statement made in Mr. Hagerty's office is that her father said, "Some of these days we are going to buy a little piece of ground and put up a small house and we'll take life easy;"—*some of these days!* What is there about this to explain the sudden early-morning rush to a lawyer's office? Not only is the suggestion of a possible retirement inadequate as a plausible reason for hurriedly giving the farm away; it is a positive argument against such a step, whether hurried or not. Do people who are planning to retire and live from their savings make preparation by giving their savings away? And upon what hypothesis did these grantors, on the very eve of expected realization, throw into the discard their high hopes for a lucrative sale of the highway lands? There is only one satisfying explanation which arises out of the case viewed as a whole, and that is that the conveyance was contrived by Zimitat as a step toward the collection from the state of moneys for the highway right of way; and that the talk of retirement, as related to the conveyance, was a casual and convenient veneer. The fact was that Zimitat could not presently give good title for his interest in the real estate and that the title could not be corrected without divulging the long-buried secret of a living, lunatic wife. Hence, as we conclude, the scheme for placing title, for the time, in the daughter. Zimitat could not make a conveyance of only the right of way to the daughter because, first, he had no description of what the state

wanted and, second, such a procedure would be badly a sub-
terfuge and would awaken inquiry from the ultimate grantees.
He could not confide the truth of his scheme to complainant
without disclosing to her his marital status. If his line of
reasoning was that by making the conveyance to his daugh-
ter, and thus causing the record to show correctly on its face,
the title would ultimately pass without question in this respect
from the state, he was correct because that is just what seems
to have happened. The right of way was, in season, conveyed
to the state, he was not called upon to make any stultifying
affidavits and he lived on as though—except for the presence
of the new highway—no transfer to the daughter had ever
been made. Whether, as a secondary incident, he was satis-
fied to have the title rest in his daughter, assured by the lat-
ter's pledge that he and complainant would remain undis-
turbed in possession and use during their joint and several
lives and contented with the thought that his family to the
exclusion of complainant's would then have the complete
ownership and use need not be considered.

We conclude that the conveyance was fraudulently repre-
sented to complainant by Zimitat as having to do only with
the right of way and that complainant executed the instru-
ment in reliance thereon. Without surmising upon whether
Mrs. Patrick knew or suspected the whole truth, we find that
she was present when the false representation was made to
complainant and that with knowledge thereof, and of the
falsity thereof, she took title and now seeks to retain to her
enrichment the fruits of a fraud wherein she thus participated.
Upon that view of the facts the propriety of equitable relief
is plain.

Complainant on this appeal abandons her claim to the
entirety and limits herself to the undivided one-half interest
in the property. The deed of August 17th, 1931, whereby
she purported to convey that interest to Mrs. Patrick is the
crux of the dispute. She considers herself aggrieved by the
dismissal of the bill on this issue and asks for relief against
the Patricks as to it. She abandons her claims against the
state, against Mrs. Zimitat except as to counsel fee and costs
allowed that defendant against complainant in the decree

appealed from, and against the Patricks in the matter of the fire loss.

We do not share the view of the learned vice-chancellor that complainant came into the Court of Chancery with unclean hands or that she falsely and fraudulently conceived her claim. Granted that her memory of the sequence of events was not in all respects accurate and that she had a more considerable knowledge of the English language than she admitted. The confusion in ideas does not go to points that we consider vital; and it is conceded that her knowledge of the English language was, in truth, limited and that her speech therein was broken and difficult. She had never acquired the ability to read or to write. Allowance must also be made in evaluating her testimony, taken through an interpreter, for the variations in idiom and sense that creep into the translating of a question and the turning back of the answer. We think that complainant was grossly deceived and that she is entitled to her remedy.

The relief accorded to complainant will be such as to restore to her the undivided one-half interest in the property conveyed by her and John Zimitat to Theresa Patrick by deed dated August 17th, 1931, less, however, all the right, title and interest of complainant in and to the lands conveyed by Mrs. Patrick and husband to the State of New Jersey by deed dated March 3d, 1932. It will include also a discovery by Mrs. Patrick of all moneys or credits which have been received by, or become due, to her arising out of or because of the lands conveyed in the 1931 deed, including the consideration from the state but excepting the collection of the fire loss which is waived; and it will further include an accounting of all moneys appearing thereby to be due complainant because of her undivided one-half interest. The dower interest of Mrs. Zimitat does not reach beyond the estate whereof her husband was at some time seized, and he was never seized of the complainant's undivided one-half interest. The dismissal of the bill as against Mrs. Zimitat and the State of New Jersey was sound; as was also the allowance against complainant of costs and counsel fee in favor of Mrs. Zimitat. The denial of relief to complainant

as against the undivided one-half interest accruing to Zimitat under the deed of February 5th, 1923, was also, in our opinion, proper.

Our findings will result in an affirmance in part and a reversal in part of the decree below. The record will be remanded to the Court of Chancery for such proceedings as are consistent with this opinion.

*For affirmance*—THE CHIEF-JUSTICE, WELLS, WOLFSKEIL, RAFFERTY, JJ.   4.

*For reversal*—CASE, BODINE, DONGES, HEHER, PERSKIE, HETFIELD, DEAR, HAGUE, JJ.   8.